EFRAIN FALCON vs. ROBERT J. LEGER & another.[1]

No. 03-P-463.

Worcester. April 8, 2004. - October 29, 2004.

Present: LENK, COWIN, & DOERFER, JJ.

*Public Policy. Contract,* Employment, Interference with contractual relations. *Employment,* Termination. *Regulation. Words,* "Actual malice."

Evidence at the trial of a claim for wrongful interference with employment supported the conclusion that the defendant, improperly motivated by his frustration with the plaintiff's resistance to his scheme to deceive a safety inspector from an independent testing laboratory, conducted himself with actual malice in firing the plaintiff from his at-will position in quality control at a wire and cable manufacturing company and, in so doing, violated clearly established public policy and lacked any legitimate corporate interest to support his action. [361-365]

CIVIL ACTION commenced in the Superior Court Department on September 9, 1996.

The case was tried before *Timothy S. Hillman,* J., and a motion for a new trial was heard by him.

*John A. Mavricos* for the defendants.

*Gregory J. Angelini* for the plaintiff.

DOERFER, J. A Superior Court jury determined that when the defendant, Robert Leger, general manager of James Monroe Wire & Cable Corp. (JM), fired Efrain Falcon, an at-will employee, he wrongfully interfered with Falcon's employment.[2] On appeal, Leger claims that the evidence does not support a conclusion that his conduct in firing Falcon from his quality control job at JM constituted "actual malice," and that the judge erroneously denied his motions for a directed verdict and

---

[1] James Monroe Wire & Cable Corp.

[2] Falcon also made a claim against JM in a separate count for wrongful termination in violation of public policy. The jury found for JM on this count. See note 15, *infra.*

judgment notwithstanding the verdict or in the alternative for a new trial.

Leger argues that the evidence was insufficient to show that he was not acting within the scope of his privilege to terminate an at-will employee when he let Falcon go, and that Falcon failed to overcome that privilege with sufficient evidence that Leger acted with a "spiteful, malignant purpose, unrelated to the legitimate corporate interest." *Shea* v. *Emmanuel College,* 425 Mass. 761, 764 (1997), quoting from *Wright* v. *Shriners Hosp. for Crippled Children,* 412 Mass. 469, 476 (1992); *Sereni* v. *Star Sportswear Mfg. Corp.,* 24 Mass. App. Ct. 428, 433 (1987). We conclude otherwise and affirm.

Our examination of the record discloses sufficient evidence of malice on Leger's part to support a conclusion that he fired Falcon for Falcon's refusal to comply with his instructions to interfere with a product inspection process conducted by a private, independent testing laboratory upon which government inspectors rely to insure the safety of the public. Such conduct amounted to a violation of a clearly established public policy grounded in statutes and regulations designed to minimize potential hazards of fire and shock associated with poorly insulated electrical wire. Consequently, as Leger's actions did not comport with any legitimate corporate interest, Falcon succeeded in establishing that Leger abused his privilege to fire Falcon.

1. *Facts.*[3] a. *Background.* JM manufactures wire and cable. In late 1994 and early 1995, Falcon and Leger worked for JM at its South Lancaster plant. Falcon began working there in 1987, mainly in the quality control department, where he was directly responsible for inspecting and testing the various types of wire and cable produced at JM to ensure that they conformed to certain safety standards prior to shipping. If during his inspections, which occurred before the wire was spooled, Falcon determined the wire to be unsafe, he would instruct the machine

---

[3]We review the evidence most favorable to Falcon to determine "whether anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff." *Boothby* v. *Texon, Inc.,* 414 Mass. 468, 470 (1993), quoting from *Poirier* v. *Plymouth,* 374 Mass. 206, 212 (1978) (internal quotations omitted).

operator to correct the problem. He would also report the nonconforming wire to his immediate supervisor.

Leger was hired by JM as general manager in February, 1994, with the expectation that he would correct some problems the company was having with quality control. Reporting directly to the president of JM, he was responsible for all departments, including quality control, and for all hiring and firing decisions. Until Falcon's discharge, Leger considered him to be a reliable and competent worker, who was rewarded with several raises. Falcon indicated that the two were generally amicable toward one another and that he knew of no reason why Leger would want to cause him harm.

Sixty percent of JM's total output was regularly sold through distributors to the industrial market. Such industrial wiring included fire alarm cable, typically installed in residences, hotels, and high rise buildings. JM industrial wire could also end up in elevators and home appliances. Such products ordinarily must meet strict safety standards meant to prevent fire and electrical shock. JM contracted with an independent, nonprofit organization, Underwriters Laboratories, Inc. (UL), to perform periodic, unannounced testing of its products. Certification by an organization such as UL assures government inspectors and the public that the wire complies with the requisite UL standards and is safe for its intended purposes, and also signifies that JM had agreed to manufacture its wire and cable in accordance with those specifications.

As a prerequisite to obtaining a UL "listing," which refers to the right to mark an approved product with the UL label, a manufacturer must sign a written agreement provided by UL. Under its agreement with UL, JM paid a fee for the right to purchase and affix UL labels upon approved wire and cable.[4] JM could purchase an unlimited quantity of labels, the prices of which varied depending upon the type of wire for which they were intended. JM stored the labels on its premises to await the step in the manufacturing process when they were placed on the

[4]JM could lose the right to adhere UL labels to any of its products if JM were to habitually ship its customers wire that a UL inspector had rejected as unsafe and placed on hold. JM could also risk the recall of such mislabeled products, presumably at its own expense.

product. The UL label for use on JM's control tray cable (tray cable), the wire at issue in this case, and entered into evidence at trial indicates, among other things, that the tray cable is "UL LISTED" for use in accordance with certain enumerated articles of the National Electrical Code.[5]

On UL's part, the organization agreed to provide regular, unannounced inspections of listed products at JM's South Lancaster factory. The purpose of the inspections was to determine compliance with each of the requisite safety standards prior to labeling and shipping of JM's products bearing the UL label. In certain circumstances, a batch of wire, while technically nonconforming, could still be deemed acceptable for labeling and shipping upon further consideration by the UL inspector as long as safety was not at issue and the variance was de minimis. In any event, it was the UL inspector, not JM, who controlled the ultimate resolution by requiring JM to avail itself of various options until the problem was corrected to UL's satisfaction.

Elizabeth Goldsmith served as the UL inspector for JM during the relevant period. She testified that the set of safety standards with which wire and cable products must conform prior to UL listing was created by UL in consultation with wire and cable manufacturers. These standards pertain to the safe conditions under which the wire may be used, such as temperature, locations (dry or wet), and the amount of maximum voltage for proper operation. UL standards also specify such criteria as the proper type and size of conductor wire and insulation, and the type and quality of compound to be used in making the insulation for the wire.

According to Leger, a twenty-two-year veteran of the cable and wire industry, assessing the safety of wire and cable essentially involves a determination that it is "capable of carrying the electricity and not producing a shock or hazard." He further asserted that a UL inspector, whom he likened to a "government inspector," tests specifically for the electrical safety and flammability of the listed wire, criteria that could affect public

[5]An inspector from UL, Elizabeth Goldsmith, testified that the only difference between the label admitted as an exhibit at trial and the label JM would have used in 1994 and 1995 was the addition of the JM name. At that time JM used a "generic" label.

safety. As an example, Leger spoke of a disastrous fire at a Las Vegas hotel involving UL approved wire that forced a reassessment and, ultimately, the creation by UL of stricter mandates for wiring in such buildings.

Part of Falcon's job in quality control was to assist Goldsmith during her unannounced visits to JM's South Lancaster facility. Goldsmith would view sample wire cuttings under JM's microscope to determine the thickness of both the copper wire and the wire's insulation at various points. On other occasions, she would send samples of compound, the raw material from which insulation is made, to UL's laboratory for compliance testing.

b. *Events leading to Falcon's discharge.* On December 7, 1994, Goldsmith visited JM and inspected samples from a lot of 50,000 feet of eighteen gauge, sixteen string, two conductor, 600 volt, "Type TC" power and tray cable. The tray cable had been wound onto twenty reels while awaiting UL labeling for shipping to Anixter, a JM customer based in Ohio. Goldsmith rejected the batch as unsafe due to nonconforming insulation and placed the whole lot on hold. On the variation notice she issued to JM, Goldsmith indicated that the problem was a "very low wall" of insulation where the two conductors intersected. Goldsmith's actual measurements ranged from a low of five to a high of twelve mils.[6] The minimum insulation width established by UL for tray cable was thirteen mils. A wire's over-all capacity to prevent shorting increases with the thickness of the wall surrounding each conductor. Although Goldsmith did not recall the substance of her conversations with either Leger or Falcon concerning her findings that day, she remembered being "horrified" at how thin the insulation was. According to Falcon, Goldsmith indicated that the order could be shipped without the UL label, but that it could not be sold for use as tray cable. On the variation notice, Goldsmith wrote, "Lot on hold pending disposition from [followup services]. Hold for release by U.L. rep."

Following Goldsmith's December 7, 1994, visit, Leger ap-

---

[6]Webster's Third New International Dictionary (1993) defines a "mil" as "a unit of length equal to $1/1000$ inch or 0.0254 millimeter used esp. for the diameter of wire."

peared concerned about Anixter's urgent need for its order, which had a specified delivery date of December 15, 1994. He admitted that any delay in its shipment would have been costly to JM.[7] Presuming that the defects in this order could be weeded out, Leger requested that Falcon and other employees go through the wire, eliminate the defective sections from the lot, and prepare it for reinspection.[8] Falcon complied, only to report to Leger days later that the wire in the order appeared to be bad throughout. According to both Leger and Falcon, it was not unusual for low points to occur in the insulation at the start-up of spooling, when tensions in the spooling machine are difficult to adjust. Ordinarily, since JM tacked on and billed for five to ten percent more wire than an order called for, problems with insulation thickness could be rectified by removing a few turns of wire from the reel and adjusting the price accordingly.

Falcon believed, based upon his experience and training in quality control and his own personal knowledge of the compound used to make the insulation on the lot of tray cable in question, that no amount of weeding of defective sections would have sufficed to correct the problem with the insulation thickness. According to him, the lot was most likely rejected because of JM's practice of mixing a nonconforming, "cheap" type of "regrinded" compound during the manufacturing process. From Falcon's perspective, such conduct by JM in violating UL standards was motivated by making profits at the expense of the safety of the general public. Falcon claimed that "sometimes we do things that is [*sic*] not legal" at JM, such as "ship it out the way it is" when in fact the wire does not meet

---

[7]As a rule, JM would scrap wire rejected by UL and sell it to a scrap reclaimer at a lower price than it would have received had the wire passed inspection. Washing off a UL label for resale was neither practical nor profitable.

[8]Prior to that, on December 8, 1994, Leger had written a letter to William Kline, a UL official, in which Leger acknowledged that he did "not totally disagree with [Goldsmith's] rejection" of the tray cable. Leger suggested an alternative method of testing that would allow the product to be released to Anixter, so long as the low points tested within two to three mils of the specified standard. Although Goldsmith recalled that Kline may have expressed an intent to allow JM some further reduction in the minimum insulation widths on the order, she could remember nothing more about that conversation. The record is unclear as to whether JM was allowed to resolve the problem in this manner.

UL specifications. Falcon apparently had participated in shipping out nonconforming wire in the past, even though he knew it was wrong. He further testified that unless someone informed Goldsmith, she would have no way of knowing the exact type of compound that had been used on the tray cable. When insulation compound is tested, which did not occur in this instance, it is done off site and prior to the extrusion process during which the insulation is placed on the wire.

Despite his doubts about the safety of the wire's insulation, Falcon complied with Leger's order to resubmit the rejected shipment to Goldsmith for reinspection when she returned on December 16, 1994. It was no surprise to Falcon when Goldsmith found the insulation to be faulty and once again ordered the shipment held.

Following Goldsmith's reinspection on December 16, 1994, Leger told Falcon to hide the whole batch of tray cable in the back of the factory and to conceal it with cardboard. To Falcon's knowledge, the bad batch of tray cable remained there until some time in early February, 1995, when Leger further ordered him to load all twenty reels on to a rental truck, where it stayed for some time, unchanged, and forever hidden from Goldsmith.

On the afternoon of February 9, 1995, Goldsmith unexpectedly returned for a final, third inspection of the Anixter order. She did not inspect the wire hidden in the rental truck on this visit. Falcon was convinced that JM deceived Goldsmith by substituting and presenting for inspection a new, conforming batch of wire in its place, and that the rejected wire was mislabeled and shipped as if it had been approved.[9]

Falcon had arrived at work around 6:00 A.M. on February 9, 1995. Within an hour or so of his arrival, he approached Leger to request a raise in his hourly pay, from $9.75 to $11 an hour. According to Falcon, Leger responded that he had no problem with the raise, but said "you have to change the way you deal

---

[9]Goldsmith claimed to have no reason to believe that the tray cable submitted to her at the third inspection on February 9, 1995, was not the same batch that she had previously tested and rejected on December 7 and December 16, 1994, and that it had been made compliant and could be released. She acknowledged, however, that she knew of nothing to prevent a manufacturer from shipping a product that UL had rejected.

with Elizabeth [Goldsmith]." When Falcon asked for clarification, Leger said, "You know we most of the time use [the] wrong compound or [the] wrong wire, but you cannot tell her that, you have to cover my back and you've got to say that we're using the right compound, the right wire." At this point, Falcon said that he could not do that, to which Leger replied, "Who pays you?" Falcon answered, "But that's not legal, [] to lie for you." When Goldsmith arrived at the plant later that day and inquired of Falcon about the whereabouts of the twice-rejected wire, Falcon ignored Leger's instructions to lie. Rather, he told her "no comment," and directed her to "see Mr. Leger."[10] Falcon contends that this action cost him his job.

Leger met with Goldsmith after her February 9, 1995, inspection. Neither testified as to the substance of their conversation. Shortly after she left, Falcon claims that he labeled the old wire with UL labels, and shipped it to Anixter, per Leger's instructions. At the end of Falcon's shift, Leger called him to his office where Leger told him he had no recourse but to fire him. Leger's stated reason was the abrasive and threatening manner in which Falcon had asked for the raise in front of other employees.

2. *UL listing and the statutory framework.* Tray cable wire, the type of wire at issue in this case, is intended to be installed in settings and in products that are subject to the National Electrical Code (NEC), and several NEC articles govern its use. The UL label affixed to the tray cable in this case states that the tray cable is "UL listed [] for use in accordance with Articles 318, 340, 500 and 501 of the National Electrical Code." Consequently, the label indicates the tray cable complies with the law of those states, such as Massachusetts, that have adopted the NEC in relevant part. See 527 Code Mass. Regs. §§ 12:00 et seq. (1993). The 1993 Massachusetts electrical code, 527 Code Mass. Regs. §§ 12.00 et seq., is the 1993 NEC as adopted and modified in part by the Commonwealth's board of fire

---

[10]Falcon claimed that he had also referred Goldsmith to Leger on the first inspection when Goldsmith asked him what kind of compound had been used on the wire.

prevention regulations.[11] It was in effect in December, 1994, through February 9, 1995. General Laws c. 148, § 10B, as amended by St. 1978, c. 295, provides: "Any person who knowingly violates any rule or regulation made by the board of fire prevention regulations shall, except as otherwise provided, be punished by a fine of not less than one hundred dollars nor more than one thousand dollars."

The intent of the Massachusetts electrical code is "the practical safeguarding of persons and property from hazards arising from the use of electricity," 527 Code Mass. Regs. § 12:00, art. 90-1. The State building code, 780 Code Mass. Regs. §§ 100 et seq. (1992), the intent of which is "to insure public safety, health and welfare . . . and, in general, to secure safety to life and property," controls "the standards or requirements for materials to be used in connection [with buildings] including but not limited to provisions for safety." 780 Code Mass. Regs. §§ 100.2, 100.4.[12] The building code incorporates the electrical code into its provisions. G. L. c. 143, §§ 94(*a*), 96; 780 Code Mass. Regs. § 100.5 & Appendix G.[13] See *Commonwealth* v. *Porrazzo*, 25 Mass. App. Ct. 169, 171 (1987).

According to the Massachusetts electrical code, only "listed" equipment and materials (i.e., those of which a representative sample have been approved and tested by a certified, independent laboratory) are acceptable in certain installations.[14] See, e.g., 527 Code Mass. Regs. § 12:00, arts. 240-4, 310-6, 310-8

---

[11]See G. L. c. 22D, § 4, added by St. 1996, c. 151, § 109 (formerly G. L. c. 22, § 14) (statutory authority for board of fire prevention regulations); c. 143, § 3L (statutory authority for promulgation of regulations relative to electrical wiring and fixtures by board of fire prevention regulations); c. 148, §§ 4, 10, 28 (statutory authority of fire marshal to enter premises to inspect, and for promulgation of fire prevention regulations and fire safety code); c. 166, § 32 (municipal inspector of wires).

[12]The relevant language was subsequently recodified at 780 Code Mass. Regs. §§ 101.2, 101.4.

[13]Recodified at 780 Code Mass. Regs. § 101.5 & Appendix A.

[14]The 1993 Massachusetts electrical code defines "Listed" as follows: "Equipment or materials included in a list published by an organization acceptable to the authority having jurisdiction and concerned with product evaluation, that maintains periodic inspection of production of listed equipment or materials, and whose listing states either that the equipment or material meets appropriate designated standards or has been tested and found suit-

(a-b), and 318-3(b)(1). Further, the Commonwealth's State and municipal inspectors may rely upon a wire's label, issued by an independent testing laboratory, as "proof that such equipment and materials have been tested and conform to suitable recognized industry standards." 527 Code Mass. Regs. § 12:00, Rule 6. See *id.*, arts. 90-4 ("The authority having jurisdiction of enforcement of the Code shall accept listed and labeled equipment or materials where used or installed in accordance with instructions included with the listing or labeling"), and 110-3 ("Suitability of equipment may be evidenced by listing or labeling"). A manufacturer is not required to choose UL as the particular listing organization with which it contracts for its listing and certification process. See note 14, *supra.*

3. *Discussion.* Viewing the evidence in the light most favorable to Falcon, *Cort* v. *Bristol-Myers Co.*, 385 Mass. 300, 301 (1982), we conclude that it permitted a rational jury to find that Leger's actions leading up to and including Falcon's termination were improperly motivated by Leger's frustration with Falcon's resistance to his scheme to deceive a UL safety inspector. This evidence sufficed to prove the requisite malevolent intent because, as matter of law, such conduct on the part of Leger violated a well-defined public policy.

In cases alleging tortious interference by the employee's supervisor or other company official who instigated the firing, malice means "actual malice" and "[a]ny reasonable inference of malice must . . . be 'based on probabilities rather than possibilities.' " *Gram* v. *Mutual Liberty, Ins. Co.*, 384 Mass. 659, 663-664 (1981), *S.C.*, 391 Mass. 333 (1984), quoting from *Alholm* v. *Wareham*, 371 Mass. 621, 627 (1976). See *Weber* v. *Community Teamwork, Inc.*, 434 Mass. 761, 781-783 (2001). "Actual malice," in this context, requires the demonstration by a preponderance of the evidence of "a spiteful, malignant purpose, unrelated to the legitimate corporate interest" on the

able for use in a specified manner." 527 Code Mass. Regs. § 12.00, art. 100. "Labeled" is defined as: "Equipment or materials to which has been attached a label, symbol, or other identifying mark of an organization acceptable to the authority having jurisdiction and concerned with product evaluation, that maintains periodic inspection of production of labeled equipment or materials and by whose labeling the manufacturer indicates compliance with appropriate standards or performance in a specified manner." *Ibid.*

part of the individual alleged to have been responsible for effecting the discharge. *Wright* v. *Shriners Hosp. for Crippled Children*, 412 Mass. at 476, quoting from *Sereni* v. *Star Sportswear Mfg. Corp.*, 24 Mass. App. Ct. at 433. See *King* v. *Driscoll*, 418 Mass. 576, 587 (1994); *Harrison* v. *NetCentric Corp.*, 433 Mass. 465, 479 n.16 (2001) ("There is no practical difference . . . between 'actual malice' and *improper* motives and means for purposes of [the tort of intentional interference by a corporate officer or supervisory employee]").

In some circumstances, malice may be demonstrated by evidence of the defendant's unjustified personal vendetta or ill will exceeding personal dislike of the employee. See *O'Brien* v. *New England Tel. & Tel. Co.*, 422 Mass. 686, 690 (1996) (supervisor's harassing behavior toward employee malicious where it was "prompted by his resentment of [the employee's] successful challenges to his decisions and her refusal to transfer out of his department"); *Mailhiot* v. *Liberty Bank & Trust Co.*, 24 Mass. App. Ct. 525, 527 (1987) (supervisor's fabricated allegations concerning employee found to be malicious). To the extent that Leger argues that Falcon presented insufficient evidence of an improper motive grounded in ill will, we are in agreement. Nothing in the record indicates that Leger's role in terminating Falcon from employment was motivated by any malicious intent to cause him harm. Nevertheless, we do not conclude, as Leger urges, that the underlying corporate activity of which Falcon complains is an "internal matter" such that Leger acted completely within the scope of his responsibilities when he fired Falcon.

It is well established that Massachusetts law does not protect at-will employees who claim to be fired for their complaints about internal company policies or the violation of company rules, even though the employees' actions may be considered appropriate and "socially desirable." *Smith-Pfeffer* v. *Superintendent of the Walter E. Fernald State Sch.*, 404 Mass. 145, 150-151 (1989) (discharge of employee for her opposition to internal restructuring of State school for mentally retarded not actionable under public policy exception). See *Mello* v. *Stop & Shop Cos.*, 402 Mass. 555, 560-561 (1988); *Wright* v. *Shriners Hosp. for Crippled Children*, *supra* at 474-475.

In *Wright*, a nurse's report to a private professional organization about perceived managerial inadequacies at the hospital was ruled an internal matter to which the public policy exception to the at-will employment doctrine did not apply. There, the court concluded that no statute applied to Wright's situation, and that the trial judge's view, based in part on State laws requiring reporting of patient abuse, was unsupported by the record. *Id.* at 473-474. The employee's reports did not allege any patient abuse or other conditions that would implicate mandated reporting. *Id.* at 474. Nor was the court aware of "any statute that clearly expresses a legislative policy to encourage nurses to make the type of internal report involved in this case." *Ibid.*

Similarly, in *Mello* v. *Stop & Shop Cos.*, *supra*, the plaintiff's discharge allegedly occurred as a result of three reports he made to his superiors about wrongdoing by store managers and buyers. Although the plaintiff failed to prove causation, the court noted that even if he had met his burden in this regard, two of his reports were unprotected by the public policy exception where they related solely to internal matters: the company's buyers' alleged personal use of rebate checks meant for the company and the managers' practice of presenting false damage and shortage claims to the company's own warehouse. *Ibid.* Termination based solely on the employee's third report, however, might have triggered liability as, unlike the wrongdoing described in the other two reports, the alleged fraud was perpetrated not on the company but on the outside manufacturers and suppliers with whom the company did business. *Id.* at 560 & n.6. In sum, no matter how well-meaning the employee's efforts may be, and regardless of a possible public interest served by those efforts, so long as the underlying corporate activity remains confined to matters that are strictly internal to the employer, the public policy exception cannot be invoked to protect the at-will employee from discharge.

On the other hand, "[r]edress is available for employees who are terminated for asserting a legally guaranteed right (e.g., filing workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury)." *Smith-Pfeffer*

v. *Superintendent of the Walter E. Fernald State Sch.*, 404 Mass. at 149-150 (citations omitted). In such instances, we look essentially to the substance of the complaint rather than to whom it is presented. See *Shea* v. *Emmanuel College*, 425 Mass. at 763 (adopting logical approach that employee's good faith internal complaint of employer's violation of criminal law need not have been reported to public authorities in order to succeed under public policy exception). See also *Mello* v. *Stop & Shop Cos*, 402 Mass. at 560 n.6 ("We assume . . . that an at-will employee who 'blew the whistle' within his company on wrongdoing is entitled to protection [even though before discharge he did not complain to public authorities]").

Here, the evidence supported the conclusion that Falcon was discouraged, both explicitly by Leger and by the implicit threat of discharge, from reporting suspected UL violations by JM that had the potential to affect the safety of the population at large. Falcon's good faith dispute with management over an electrical product deemed to be unsafe by an independent testing laboratory concerned much more than just matters internal to JM.

Our cases have suggested that an employee could be shielded from the risk of discharge if he or she reasonably, but perhaps erroneously, reports that an employer is violating State and municipal laws and ordinances concerning public safety. See *ibid.* (court assumes, without deciding, that "whistleblowing based on a reasonable, good faith [but erroneous] belief that the employer is violating the law should be protected in particular instances"). See also *Hobson* v. *McLean Hosp. Corp.*, 402 Mass. 413, 416 (1988) (hospital employee responsible for enforcing State safety regulations governing patient care, alleging to have been fired for performing her job accordingly, stated claim for wrongful termination under public policy exception). Compare *Mistishen* v. *Falcone Piano Co.*, 36 Mass. App. Ct. 243, 246 (1994). In *Mistishen*, the plaintiff alleged that she was terminated for expressing disapproval of the employer's failure to disclose to customers the poor quality of the employer's product: pianos. *Id.* at 244. In dismissing her action for failure to state a claim, we duly noted that "[w]hile the act performed by the plaintiff might be viewed by some as appropriate and socially desirable," what proved fatal to her claim was the

absence of any allegation that the employer's "wrongdoing put the consumer in harm's way or otherwise presented a threat to public health or safety." *Id.* at 246.

Here, Falcon presented ample evidence that Leger's conduct, although possibly not "illegal" in the sense of creating criminal liability, as Falcon may have believed, nevertheless presented a threat to the public safety and was otherwise unlawful. Examination of the applicable statutes and regulations indicates that the relationship between UL safety standards and the NEC is such that any attempt to interfere with UL testing and labeling procedures is tantamount to committing a fraud upon those State inspectors who rely upon UL procedures to ensure public safety. Where Falcon's claims are grounded in regulations directly bearing on public safety, we will give weight to the statement of public policy that such regulations represent. See *Smith-Pfeffer* v. *Superintendent of the Walter E. Fernald State Sch.*, 404 Mass. at 151 (issue whether public policy was violated is question of law for judge, not jury). Hence, we conclude that the facts in the instant case are more akin to the allegations set forth in *Hobson* (plaintiff alleging discharge for attempting to enforce patient safety regulations, for which the court concluded liability could be imposed, if proved) than those advanced in *Wright* (professional code of ethics) and totally lacking in *Smith-Pfeffer*.[15]

*Judgment affirmed.*

*Order denying motion for judgment notwithstanding the verdict or for new trial affirmed.*

---

[15]Leger's argument that nothing remained against him individually in Falcon's case once the jury returned a verdict in favor of JM on the count alleging wrongful termination in violation of public policy is without merit. Once the jury made the factual determination that JM neither deliberately mislabeled nor shipped non-UL approved cable, they proceeded no further, as instructed on the special verdict form. Thus, they did not reach the issue whether JM terminated the plaintiff in violation of any public policy. Consequently, no significance can be attached to the verdict on the count against JM, particularly with reference to Leger and the evidence presented against him individually on the count alleging tortious interference.